## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

_____

| | : | |
|---|---|---|
| LAURIE STERNBERG, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 09-2263 (JAP) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| Defendant, | : | |
| | : | |

_____:

PISANO, District Judge.

Before the Court is Laurie Sternberg's ("Plaintiff") appeal from the final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's

request for disability insurance benefits ("DIB").  The Court has jurisdiction to review this

matter under 42 U.S.C. § 405(g) and renders its decision without oral argument.  *See* Fed. R. Civ.

P. 78.  For the reasons expressed below, the record provides substantial evidence supporting the

Commissioner's decision that Plaintiff was not disabled.  Accordingly, the Court affirms.

## I.      PROCEDURAL HISTORY

Plaintiff filed an application for DIB on December 13, 2005, alleging she has severe,

disabling, physical impairments that included osteoarthritis in her knees, degenerative disc

disease, pelvic pain/dislocation, arm weakness/pain, and rheumatoid arthritis.  She alleges her

disability began on March 18, 2004.  Plaintiff last met the insured status requirement of the

Social Security Act on December 31, 2005.  She was denied DIB on April 12, 2006, and again

on reconsideration on October 13, 2006.  Plaintiff filed a request for a hearing on November 20,

2006.  The hearing was held on March 17, 2008 before Administrative Law Judge Daniel N.

Shellhamer (the "ALJ").  On August 11, 2008, the ALJ issued a decision concluding that

Plaintiff was not disabled under the relevant sections of the Social Security Act through

December 31, 2005, the date last insured.  The Social Security Appeals Council denied

Plaintiff's request for review on April 10, 2009.  This action followed.

## II.     FACTUAL HISTORY

Plaintiff was born on January 9, 1956 and was previously the owner/operator of a retail

appliance store from 1980-2000 (R. 87).  She was involved in sales where she acted as a buyer

and merchandiser of the store.  Additionally, she acted as a liaison with the vendors and took part

in advertising, financing and other management level duties.  Plaintiff lives alone in a single

story house.

Prior to the alleged date of onset, Plaintiff was a marathon runner with a history of knee

problems.  She first sought medical treatment for her knees in 1998.  In 1999, Plaintiff was

diagnosed with a benign tumor on her left femur.  This resulted in her left leg being weaker than

her left.  Later that year, she underwent arthroscopic surgery for torn medial and lateral menisci

in her left knee. A few months later a similar procedure was performed on the right knee.

Plaintiff continued to experience pain and she was subsequently diagnosed with moderate

arthritis is both knees.  In November 2001, she was advised by Dr. Mark Seckler, Plaintiff's

orthopedist since 2001, to continue wearing an unloader brace on her right knee.  (R. at 559.)  In

January 2002, she received the first of a series of injections designed to relieve the pain.  (R. at

560.)  Five injections were performed on each knee.  (R. at 564.)

Plaintiff alleges her disability began on March 18, 2004.  (R. at 12.)  On March 31, 2004,

Dr. Dominic Mazzochi, M.D., referred Plaintiff to New Jersey Diagnostic Imaging and Therapy,

P.A. to obtain X-rays.  (R. 390.)  The X-rays of Plaintiff's lumbar spine showed minimal

degenerative changes, and x-rays of the cervical spine showed degenerative changes at C5-6 and slight reversal of the normal cervical lordosis.  (R. 390).  In April 2004, Dr. Mazzochi referred her to New Jersey Diagnostic Imaging and Therapy to obtain an MRI of the lumbar and cervical spine.  The MRI of the lumbar spine revealed a disc herniation at L5-S1 and a disc bulge at L4-5. (R. at 388.)  The MRI cervical spine showed small disc protrusions at C3-4 and C6-7, and mild diffuse disc bulges at C4-5 and C5-6. (R. at 388-89.)

In April 2004, Dr. Seckler, an orthopedist, stated that Plaintiff's prior knee problems were minimal and almost resolved.  (R. at 194.)  An MRI of the left knee, dated April 26, 2004, showed a partial medial meniscectomy and was suggestive of a recurrent tear of the medial meniscus with a loss of articular cartilage and edema (R. 386-87).  Upon follow up on May 4, 2004, Dr. Seckler noted that Plaintiff was histrionic and that her complaints were grossly disproportionate to the objective findings.  (R. at 193).  Plaintiff attended physical therapy from May 18 through December 23, 2004 and was discharged with minimal complaints of difficulty and pain.  (R. at 223.)

Between April and June 2004, Dr. Seckler saw Plaintiff for complaints of knee problems, pain in her neck, and headaches.  On June 24, 2004, Dr. Seckler again reported that "her concerns and complaints [are] grossly disproportionate to objective findings."  (R. at 192.)  Dr. Seckler noted that Dr. Michael O' Hara, Plaintiff's pain management specialist, felt the same. *Id.*  Dr. Seckler recommended that Plaintiff speak to a psychiatrist because he felt that she suffered from depression and somatization.  *Id.*

Plaintiff complained of mild weakness of the right bicep in May 2004.  (R. at 365.)  An examination by Dr. Susan Lage, a neurologist, showed limited rotation to the right and some spasm. (R. at 373.)  An EMG of the right arm returned normal and she was recommended for

3

physical therapy.  (R. at 375.)  In June 2004, Plaintiff complained of left lumbar radicular pain—

an EMG of the left leg returned normal.  (R. at 358, 362)

In July 2004, Plaintiff was diagnosed with cervical herniated nucleus pulposus, thoracic

myofascitis and lumbar herniated nucleus pulposus.  (R. at 195.)  On July 22, 23, and 24 Plaintiff

received spinal manipulation under anesthesia including: manipulation of the cervical, dorsal and

lumbar spine, iliopsos stretch, and piriformis bow-string stretch.  (R. at 195-218.)  Subsequent to

the procedures, Dr. O'Hara stated that considering the improvement in function and diminishing

pain, her prognosis was good. (R. 202, 211).

On July 27, 2004, Dr. Manuel Banzon, an orthopedist, saw Plaintiff for her complaint of

left knee pain.  (R. at 222.)  She was diagnosed with left medial compartment arthritis and was

treated with Synvisc injections to the left knee.  *Id.*  Between August and September 2004,

Plaintiff received a series of three injections. (R. 212).  On October 12, 2004, Plaintiff underwent

arthroscopic surgery on her left knee.  (R. at 221.)  The procedure included: partial medial and

lateral meniscectomy, chondroplasty and synvectomy.  *Id.*  During the surgery Dr. Banzon found

that there was significant damage to the articular surface of the knee.  *Id.*  He recommended

physical therapy, Chondroitin, Cosamine sulfate, and Flexoril.  (R. at 220-21.)  On two separate

follow up visits, November 1 and 22, 2004, Dr. Banzon noted Plaintiff's knee was much

improved.  (R. at 220.)  On January 7, 2005 Dr. Banzon indicated Plaintiff was doing very well

and responded to the conservative treatment.  (R. at 219.)

Also in August 2004, Plaintiff complained low back pain.  Dr. Banzon performed and

examination and noted a diminished range of motion, spasms in the paralumbar area, and straight

leg raising was positive at 30 degree bilaterally. (R. at 222.)  In November 2004, Dr. O'Hara

reported that trigger point injections to Plaintiff's cervical region were very beneficial for her

cervicalgia (neck pain that does not radiate outwards).  (R. at 513.)  In December 2004 and

January 2005, Plaintiff received lumbar epidural steroid injections at L5-S1 from Dr. O'Hara.

(R. at 510-12.) During a follow up on January 26, 2005, Plaintiff reported improvement from the

first two injections.  (R. at 508.)  She received a chiropractic adjustment a few days after the

third injection and reported some lower back and hip pain.  *Id.*  Plaintiff received another

injection in March 2005, but there was no improvement.  (R. at 506.)  On April 15, 2005, Dr.

O'Hara performed lumbar discography at L3-4, L4-5 and L5-S1.  (R. at 349.)  A CT scan of the

lumbar spine was taken the immediately after the procedure and revealed annular tears on the

right side at L3-4, L4-5 and L5-S1, some disc herniation at L4-L5, and a small disc herniation at

L5-S1.  (R. at 351.)

In May 2005, Plaintiff saw Dr. Lage for low back pain radiating down both legs.  (R. at

367.)  She was scheduled for an EMG of the left lower extremity which returned essentially

normal. (R. at 371.)  On June 14, 2005, Dr. Bruce Rosenblum, a neurological surgeon, saw

Plaintiff for her complaint of back pain radiating down the left leg, accompanied by left leg

weakness.  Plaintiff stated that epidural injections, chiropractic care, and medications did not

treat her pain.  (R. at 375.)  An MRI of the lumbar sacral spine revealed no major occlusion of

the spinal canal or neural foramen.  (R. at 376.) Dr. Rosenblum noted that he was not sure where

her pain was coming from and all tests, including an EMG/NCV study, were within normal

limits.  *Id.*

An MRI of the lumbar spine performed in June 2005 showed a minimal disc bulge at L5-

S1, but a subtle disc herniation previously located at L5-S1 was no longer present.  (R. at 382-

83.)  In July 2005, Dr. Paul Marcotte, a neurologist, evaluated Plaintiff for back and leg pain she

had experienced since 2004.  (R. at 400.)  Dr. Marcotte noted that Plaintiff complained of

chronic back pain and left leg pain. (R. at 401.)  He reported associated swelling in Plaintiff's leg but found minimal degenerative changes in her lumbar spine.  *Id.*  An EMG and diskogram "did not indicate an obvious cause for her symptoms."  *Id.*  He recommended imaging studies of the pelvis to rule out an interpelvis cause for her symptoms.  *Id.*

In August 2005, Dr. Craig Israelite, an orthopedist, noted some medial joint line pain and mild swelling, but no gross instability.  (R. at 399.)  Dr. Israelite reported that the cause of Plaintiff's symptoms was most likely underlying degenerative arthritis of the left knee and indicated she would not benefit from arthroscopy.  *Id.*  He additionally noted that he was against arthroscopic surgery for the left knee.  (R. at 399.)  In late September 2005, an MRI of Plaintiff's left knee further showed osteoarthritis of the medial compartment.  (R. at 397.)  Dr. Israelite suggested she may need knee replacement, but recommended putting off the replacements as long as possible and use conservative treatment.  *Id.*

Plaintiff received additional physical therapy from October 2 through December 4, 2005. (R. at 402-488.)  In the physical therapy discharge summary, it is noted that Plaintiff reported that her back was staying in alignment more frequently, that she was capable of putting in back in place on her own with the exercises she learned at therapy, and that she was joining a health club to continue her exercise.  (R. at 402.)  In October 2005, Dr. Renay Friedman, Plaintiff's treating chiropractor since June 2004, noted she was improving with the physical therapy and chiropractic treatment.  (R. at 528.)

Plaintiff began to see Dr. Sawsen Najmey, a rheumatologist, in July 2005.  (R. at 495.) She was diagnosed with osteoarthritis and showed improvement on Prednisone. (R. at 494.) When the dose was lowered, Plaintiff reported that she would experience more pain and swelling.  (R. at 493, 494.)

Plaintiff's insured status ended on December 31, 2005.  Plaintiff's medical records indicate she continued to see her doctors regarding her back and leg pain between 2006 and 2008.

## III.  LEGAL STANDARD FOR DISABILITY BENEFITS

### 1.  Disability Defined

To be eligible for DIB, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  A person is disabled for these purposes only if his physical and mental impairments are "of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy…" 42 U.S.C. § 423(d)(2)(A).

### 2.  The Five-Step Analysis for Determining Disability

Social Security regulations set forth a five-step, sequential evaluation procedure to determine whether a claimant is disabled.  20 C.F.R. § 404.1520.  For the first two steps, the claimant must establish (1) that she has not engaged in "substantial gainful activity" since the onset of his alleged disability, and (2) that she suffers from a "severe impairment" or "combination of impairments."  20 C.F.R. § 404.1520(b)-(c).  Given that the claimant bears the burden of establishing these first two requirements, her failure to meet this burden automatically results in a denial of benefits, and the court's inquiry necessarily ends there.  *Bowen v. Yuckert*, 482 U.S. 137, 146-47 n. 5 (1987) (delineating the burdens of proof at each step of the disability determination).

If the claimant satisfies her initial burdens, she must provide evidence that his impairment is equal to or exceeds one of those impairments listed in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(d). Upon such a showing, she is presumed to be disabled and is automatically entitled to disability benefits. *Id*. If she cannot so demonstrate, the benefit eligibility analysis requires further scrutiny.

The fourth step of the analysis focuses on whether the claimant's residual functional capacity ("RFC") sufficiently permits her to resume his past relevant work. 20 C.F.R. § 404.1520(e)-(f). Again, the burden lies with the claimant to show that she is unable to perform his past work. *Fargnoli v. Halter*, 247 F.3d 34, 39 (3d Cir. 2001). If the claimant is found to be capable to return to her previous line of work, then she is not "disabled" and not entitled to disability benefits. *Id*. Should the claimant be unable to return to her previous work, the analysis proceeds to step five.

At step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other substantial, gainful work. 20 C.F.R. § 404.1520(g); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987). If the Commissioner cannot satisfy this burden, the claimant is "disabled" and will receive social security benefits. *Yucker*t, 482 U.S. at 146-47 n. 5.

**3.  The Record Must Provide Objective Medical Evidence**

Under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, a claimant is required to provide objective medical evidence in order to prove his disability. 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")' 42 U.S.C. § 423(d)(5)(A) ("In making determinations with respect to disability under this subchapter, the provisions of section[] . . . 423(d)(5) of this title shall apply in the same

manner as they apply to determinations of disability under subchapter II of this chapter."). Accordingly, a plaintiff cannot prove that she is disabled based on solely her subjective complaints of pain and other symptoms.  *See Green v. Schweiker*, 749 F.2d 1066, 1069-70 (3d Cir. 1984).  ("[S]ubjective complaints of pain, without more, do not in themselves *constitute* disability.").  She must provide medical findings that show that she has a medically determinable impairment.  *See id*.; *see also* 42 U.S.C. § 423(d)(1)(A) (defining "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment").

Moreover, a claimant's symptoms, "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect [one's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."  20 C.F.R. § 404.1529(b); *see Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (rejecting claimant's argument that the ALJ failed to consider his subjective symptoms when the ALJ had made findings that his subjective symptoms were inconsistent with objective medical evidence and the claimant's hearing testimony); *Williams*, 970 F.2d at 1186 (denying claimant benefits where claimant failed to proffer medical findings or signs that he was unable to work).

## IV.  STANDARD OF REVIEW

The district court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." 42 U.S.C. § 405(g); 1383(c)(3) ("The final determination of the Commissioner . . . shall be subject to judicial review as provided in section 405(g) . . . ."); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied sub nom. Williams v. Shalala*, 507 U.S. 924 (1993).  "Substantial evidence" means more than "a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*,

9

305 U.S. 197, 229 (1938)).  "Substantial evidence" is "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Id*.  The inquiry is not whether the

reviewing court would have made the same determination, but rather whether the

Commissioner's conclusion was reasonable.  *Brown v. Bowen*, 845 F. 2d 1211, 1213 (3d Cir.

1988).  Thus, substantial evidence may be slightly less than a preponderance.  *Stunkard v. Sec'y*

*of Health & Human Servs*., 841 F. 2d 57, 59 (3d. Cir. 1988).  Some types of evidence will be

"substantial."  For example,

> '[a] single piece of evidence will not satisfy the substantiality test if the
> [Commissioner] ignores, or fails to resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it is overwhelmed by other evidence –
> particularly certain types of evidence (e.g. that offered by treating physicians) – or
> if it really constitutes not evidence but mere conclusions.'

>    *Wallace v. Sec'y of Health & Human Servs*., 722 F.2d 1150, 1153 (3d Cir. 1983)

(quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

The reviewing court must review the evidence in its totality.  *See Daring v. Heckler*,

727 F.2d 64, 70 (3d Cir. 1984).  In doing so, "a court must 'take into account whatever in the

record fairly detracts from its weight.'"  *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J.

1997) (quoting *Willibanks v. Sec'y of Health & Human Servs*., 847 F.2d 301, 303 (6th Cir. 1988)

(internal citation omitted)).  The Commissioner has a corresponding duty to facilitate the court's

review: "Where the [Commissioner] is faced with conflicting evidence, he must adequately

explain in the record his reasons for rejecting or discrediting competent evidence."  *Ogden v.*

*Bowen*, 677 F. Supp. 273, 278 (MD. Pa. 1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d

Cir. 1986)).  As the Third Circuit has held, access to the Commissioner's reasoning is indeed

essential to meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (quoting *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977)).  Nonetheless, the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams*, 970 F.2d at 1182 (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir. 1984)).

## V.  THE ALJ'S DECISION

Through an application of the five-step analysis to the facts from the record, the ALJ determined that Plaintiff is not entitled to disability insurance benefits.  The ALJ found that Plaintiff satisfied the first step of the analysis because she had not engaged in substantial gainful activity since 2000.  Moving to step two, the ALJ concluded Plaintiff satisfied this step because she had the following severe impairments through the date of last insured: bilateral knee osteoarthritis, lumbar and cervical degenerative disc disease with radiculopathy, pelvic pain/dislocation, right arm weakness/pain and rheumatoid arthritis.  The ALJ also noted that Plaintiff claimed to suffer from depression and anxiety, but concluded that her alleged mental impairment "was not sever prior to December 31, 2005 (her date last insured), as it did not cause more than minimal limitations in her ability to perform basic work activities."  (R. 15.)

At Step Three, the ALJ concluded that through the date of last insured, Plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  The ALJ compared Plaintiff's bilateral knee osteoarthritis and right arm numbness to Section 1.02—major dysfunction of a joint.  The ALJ found that Plaintiff's condition did meet the listing because "the required evidence of limitation of motion and

11

inability to ambulate effectively … was not consistently present." (R. 16.)  Although the ALJ

noted that Plaintiff had some limitation in her ability to walk, he concluded that the osteoarthritis

in her knees "has not approached listing level severity since March 18, 2004." *Id.*  The ALJ also

concluded that Plaintiff's right arm numbness also failed to meet the requirements of Section

1.02 because there was no diagnostic imaging that showed joint space narrowing, bony

destruction or ankylosis of the upper extremity joints and, further, Plaintiff did not demonstrate

that fine and gross movements could not effectively be performed.  The ALJ also found that

limitation of motion of both upper extremities was absent.

Next, the ALJ determined that the relevant listed impairment that compared most closely

with Plaintiff's cervical and lumbar degenerative disc disease and pelvic pain/dislocation was

Section 1.04A  The ALJ concluded the requirements of 1.04A, in particular motor loss

accompanied by sensory or reflex loss and positive straight leg testing, were not consistently

documented.  He noted also that there was no evidence of muscle atrophy.

The ALJ found the listed impairment that compared most closely to Plaintiff's

rheumatoid arthritis was Section 14.09A—inflammory arthritis.  He found that the requirements

of the listing of an inability to ambulate effectively, limitation of motion of both upper

extremities, and an inability to perform fine and gross movements effectively were not

consistently present prior to the date of last insured.  Consequently, the ALJ concluded that this

listing had not been met.

Overall at Step Three, the ALJ concluded that Plaintiff's bilateral knee osteoarthritis,

lumbar degenerative disc disease with radiculopathy, pelvic pain/dislocation, cervical

degenerative disc disease with radiculpathy, right arm weakness/pain and rheumatoid arthritis,

either individually or in combination, were not consistently at listing severity for any uninterrupted period of 12 consecutive months during the relevant period.  (R. 17).

At Step Four, the ALJ concluded that Plaintiff had the residual functional capacity to perform a full range of sedentary work.  The ALJ found that Plaintiff had relatively minor postural limitations restricting her to only occasional balancing, stooping, kneeling, crouching, and climbing, of stairs and ramps, and precluding her from crawling and climbing ladders and scaffolds.  The ALJ found that Plaintiff was unable to perform her past relevant work, which, according to the vocational expert, she performed at the medium exertional level.

Finally at Step Five, the ALJ considered Plaintiff's age, education, work experience, and residual functional capacity through the date of last insured, and found that jobs existed in significant numbers in the national economy that Plaintiff could have performed.  He concluded, therefore, that Plaintiff was not disabled, as defined in the Social Security Act, on or prior to December 31, 2005, her date last insured.

## V.    ANALYSIS

Plaintiff raises several challenges to the ALJ's decision.  First, she argues that the ALJ did not properly evaluate the medical evidence because: (1) certain findings were allegedly contradictory, Pl.'s Br. 19; (2) the ALJ failed to give proper credence to the Plaintiff's subjective complaints of pain or mental impairments, *id.*; and (3) the ALJ relied heavily on his own interpretation of the medical evidence and isolated statements in doctors' notes, *id.* at 21. Plaintiff further argues that the ALJ's conclusion regarding Plaintiff's residual functional capacity was not supported by substantial evidence.  Pl.'s Br. 26.

1.      **The ALJ Properly Evaluated the Medical Evidence**

      A.      **The ALJ's Findings Are Not Contradictory**

Plaintiff argues that certain of the ALJ's findings were contradictory because he stated that Plaintiff's impairments caused significant limitations on her ability to perform basic work activities (R. 15), but later referred to other of her limitations as "slight[]" or "minor." (R. 27). These statements are not contradictory. The ALJ was first referring to Plaintiff's severe impairments, which, as Defendant points out, by definition cause significant limitations. *See* 20 C.F.R. § 404.1521(a) (stating that an impairment is not severe if it does not significantly limit a person's physical or mental ability to do basic work activities). Thereafter, the ALJ referred to Plaintiff's *non-exertional* limitations as minor. In this regard, the ALJ found that Plaintiff had minor postural limitations restricting her to occasional balancing, stooping, keeling, crouching, and climbing of stairs and ramps, and precluded her from crawling, and climbing ladders or scaffolds. *Id.* It is no doubt possible for a person to have impairments that can cause significant exertional limitations but only minor non-exertional limitations. *See* 20 C.F.R. § 404.1569a (explaining that exertional limitations affect a person's ability to meet the strength demands of a job, *e.g.*, lifting and carrying, while non-exertional limitations affect a person's ability to meet the demands of a job other than strength demands). The Court finds nothing contradictory in the ALJ so finding. As such, Plaintiff's argument is without merit.

      B.  **Substantial Evidence Supports the ALJ's Findings as to Plaintiff's Subjective Complaints**

After conducting a thorough review of the medical evidence of record (R. 18-24), the ALJ concluded that although Plaintiff's medically-determinable impairments could reasonably produce the symptoms she complained of, her statements regarding "the intensity, persistence and limiting effects of her symptoms" were not entirely credible because they were not

14

consistent with the objective medical evidence (R. 26).  Plaintiff contends the ALJ erred in so

finding because he did not give "proper credence" to her complaints of "pain, limitation of

motion and function, weakness, fatigue, numbness and spasms" and failed to take into account

the amount of medications she was taking when making the credibility assessment.  *Id.*

"Allegations of pain and other subjective symptoms must be supported by objective

medical evidence."  *Hartranft*, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529).

Here, the objective evidence of record supports the ALJ's conclusion.  For example, shortly after

the alleged onset date, in April 2004, Dr. Seckler stated that Plaintiff's knee problems were

minimal and almost resolved.  (R. at 194).  Moreover, in both May and June of 2004, Dr. Seckler

noted that plaintiff's complaints were "grossly disproportionate to the objective findings" and

that  Plaintiff's pain management specialist, Dr. O'Hara, agreed.  (R. 192, 193).   According to

Dr. Seckler, Plaintiff was "fine" orthopedically, but she needed "to speak to a psychiatrist"

because he believed she may have a form of depression.  (R. 192).  On July 15, 2004, an EMG of

Plaintiff's left leg was normal.  (R. 357-58).

Later that year, Plaintiff was diagnosed with a tear of the medial meniscus in her left

knee.  She underwent surgery in October of 2004 and medical records reflected substantial

improvement in the weeks following surgery.  *See*, *e.g.*, R. 220 ("left knee is much improved").

In September 2005, Plaintiff consulted Dr. Israelite with regard to her left knee.  He noted that

she had underlying degenerative joint disease and "may need a knee replacement down the

road," but he felt this should be done only if Plaintiff's symptoms "become disabling" at some

future date.  (R. 397).

In support of her argument, Plaintiff points to a L5-S1 disc herniation that is shown in an

MRI performed on April 16, 2004 (R. 572).  However, a later report refers to this herniation as

15

"very subtle" and, in an MRI performed on June 16, 2005, the herniation is no longer evident. (R. Tr. 382-83).  On July 12, 2005, Dr. Rosenblum, having reviewed the later MRI as well as "all of the tests which have been performed including an EMC/NCV study which was within normal limits," could find no basis for the pain Plaintiff complained of.  (R. 376).  Similarly, on July 13, 2005, Dr. Marcotte reported that tests "did not indicate an obvious cause" for Plaintiff's symptoms, and saw no indication to consider lumbar surgery.  (R. 401).

Plaintiff was seen by Dr. O'Hara in November of 2005 for low back pain and he reported that she was "dramatically improved" after taking Prednisone.  (R. 499).  In December, Dr. O'Hara notes that Plaintiff reported that she was significantly improved after being put on a medical regimen and undergoing physical therapy.  (R. 498).

Shortly after Plaintiff's insured status expired, Plaintiff a consultative examination was performed by Dr. Ronald Bagner.  (R. 532-34).  Dr. Bagner diagnosed cervical sprain/strain, lumbosacral strain, and degenerative arthritis of the left knee.  He noted that Plaintiff stood during the interview, ambulated without difficulty, got on and off the examination table without difficulty, dressed and undressed without assistance, did not use a cane or crutches, and could walk heel to toe.  (R. 533).  In the section of his chart relating to the lumbar spine, Dr. Bagner notes that Plaintiff was able to squat, walk on her heels and walk on her toes, and she did not suffer from any sensory or reflex loss.  (R. 536).

Contrary to Plaintiff's argument, the ALJ did not disregard Plaintiff's the fact that Plaintiff took various medications in determining that her complaints of pain were not entirely credible.  *See* Pl.'s Br. 23. The ALJ discussed the medications on several occasions. (R. 19, 20, 22, 24.)  Throughout his decision, the ALJ clearly considered all of the treatment received by Plaintiff, including her surgeries, knee braces, injections, physical therapy, chiropractic treatment

and medications. (R. 18-22).  Consequently, the Court finds there is substantial evidence to

support the ALJ's conclusion regarding Plaintiff's subjective complaints.

### C.  The ALJ Properly Considered Plaintiff's Mental Impairments

Plaintiff argues the ALJ failed to give proper credence to Plaintiff's anxiety, insomnia,

and depression.  Pl.'s Br. 19.  However, the ALJ noted that Plaintiff received no psychiatric

treatment, with the exception of sleep aids, prior to the expiration of her insured status on

December 31, 2005.  (R. 25).  Subsequently, on June 13, 2006, Plaintiff saw Dr. Jay Gordon for

a neuropsychologial evaluation.  (R. 674).  Dr. Gordon's records note that "[p]rior psychiatric

history is denied."  (R. 675).  Further, Dr. Gordon believed "with a reasonable degree of

neuropsychological certainty" that Plaintiff's emotional difficulties were causally related to a

motor vehicle accident in which she was involved on May 4, 2006, which is outside the relevant

time period.  The Court finds that the ALJ appropriately considered Plaintiff's mental

impairments and the substantial evidence supports his conclusions with respect to those

impairments.

### D.  The ALJ Did Not Improperly Rely on His Own Interpretation of the Medical Evidence and Isolated Statements in the Doctors' Notes

Plaintiff alleges the ALJ improperly relied on his own interpretation of the medical

evidence and isolated statements of doctors' notes "while ignoring the remainder of the objective

findings."  Pl.'s Br. 21.  As to the latter, the ALJ's thorough decision shows that he undertook a

comprehensive analysis of the evidence.  It is clear that he considered the record as a whole in

reaching his conclusions.

Nor did the ALJ improperly interpret the medical evidence himself.  In support of her

argument in this regard, Plaintiff points to a letter from Dr. O'Hara dated April 8, 2008, in which

Dr. O'Hara opined that Plaintiff "should be considered unemployable/disabled."  (R. 861).  That

the ALJ gave this opinion "little or no weight" was not improper.  It is up to the Commissioner to render a decision regarding a claimant's disability.  20 C.F.R. § 404.1527(e)(1).  Therefore, a doctor's opinion regarding a claimant's disability will not be accorded "special significance."  20 C.F.R. § 404.1527(e)(3).   Moreover, Dr. O'Hara's opinion was given years after the relevant time period.  The ALJ did not err in giving that opinion little or no weight.

### E.  There is Substantial Evidence to Support the ALJ's Residual Functional Capacity Determination

Plaintiff argues that the ALJ's decision regarding her residual functional capacity was not supported by the medical evidence.  Pl.'s Br. 26.  When determining an individual's residual functioning capacity, the ALJ must consider all relevant and medical evidence.  20 C.F.R. §404.1545 (3).  Here, the Court finds that substantial evidence supports the ALJ's finding that Plaintiff retained the RFC was a full range of sedentary work.

Plaintiff argues there is no medical evidence to support the ALJ's conclusion that she could perform sedentary work.  However, the ALJ relied in large part, although not entirely, on an assessment done by a state agency consultant, Dr. Eden Atienza, M.D.  Dr. Atienza assessed Plaintiff's functional abilities and concluded Plaintiff was capable of light work.  (R. 183-90).  Pursuant to the relevant regulations, state agency medical consultants are "highly qualified physicians ... who are also experts in Social Security disability evaluation."  20 C.F.R. § 416.927(f)(2) (i).  Accordingly, while not bound by findings made by reviewing physicians, the ALJ is to consider those findings as opinion evidence, and is to evaluate them under the same standards as all other medical opinion evidence.  20 C.F.R. § 416.927(f)(2)(ii).

Although Dr. Atienza concluded Plaintiff was capable of light work, the ALJ, upon consideration of other medical evidence of record, found that Plaintiff could not stand and/or

walk for long periods.  Therefore, the ALJ concluded she could not perform light work, but, found she was capable of performing substantially all of the requirements of sedentary work.

Plaintiff further asserts, however, that because the ALJ found Plaintiff could perform "substantially all" of the requirements of sedentary work, this constituted a finding that Plaintiff could perform less than the full range of sedentary work and, therefore, the ALJ was required to use a vocational expert to determine whether and to what extent jobs existed in the national economy that Plaintiff could perform.   However, the "full range" of sedentary work has been defined as the ability "to perform substantially all of the strength demands defining the sedentary level of exertion, as well as the physical and mental nonexertional demands that are also required for the performance of substantially all of the unskilled work considered at the sedentary level." Social Security Ruling 96-9p.  Accordingly, the Court finds no error.

### VI. CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ's findings are supported by substantial evidence, and, therefore, affirms the Commissioner's final decision denying benefits for Plaintiff.  An appropriate Order accompanies this Opinion.


/s/ JOEL A. PISANO
United State District Judge

Date: September 30, 2010